CHARLES E. BANKS AND ROSE M. BANKS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Banks v. Commissioner
Docket No. 15929-88
United States Tax Court
T.C. Memo 1991-641; 1991 Tax Ct. Memo LEXIS 700; 62 T.C.M. (CCH) 1611; T.C.M. (RIA) 91641; December 26, 1991, Filed *700 Decision will be entered under Rule 155. Leo K. O'Brien, for the petitioners. Bruce A. Anderson, for the respondent. RUWE, Judge. RUWE
BMEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies and additions to tax in petitioners' Federal income tax as follows: Additions to Tax
Year
Deficiency
Sec. 6653(a)(1) [1]
Sec. 6653(a)(2)
Sec. 6661
1982
$ 15,377
$ 769
50 percent of
$ 3,844
the interest
due on $ 15,377
1983
15,171
759
50 percent of
3,793
the interest
due on $ 15,171
1984
14,768
738
50 percent of
3,692
the interest
due on $ 14,768
After concessions, [2] the issues for decision are: (1) Whether Rose M. Banks (hereinafter petitioner) received unreported income in the amounts of $ 47,430, $ 52,266, *701 and $ 43,382 for the taxable years 1982, 1983, and 1984, respectively; (2) whether petitioners are liable for additions to tax under section 6653(a)(1) and (2) for negligence or intentional disregard of rules or regulations; and (3) whether petitioners are liable for additions to tax under section 6661 for substantial understatement of income tax liability. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, and attached exhibits are incorporated *702 herein by this reference. Petitioners resided in Colorado Springs, Colorado, at the time they filed their petition in this case. Petitioners were married on December 29, 1961, and have seven children ranging in age from 15 years to 26 years. Charles E. Banks was born on September 24, 1939, and was honorably discharged from the U.S. Army (Field Artillery) on June 30, 1982, with the rank of E-7 after 20-1/2 years of service. Charles E. Banks' last overseas assignment was in Bamberg, Germany, from November 1978 to May 1981, and his last assignment before discharge was Fort Sill, Oklahoma, from May 1981 to June 1982. Petitioner was born on February 11, 1945, and was in the eleventh grade of high school when she married Charles E. Banks. After their marriage, petitioner accompanied her husband on all his military assignments except his last assignment at Fort Sill, Oklahoma, when petitioner and her family returned to Colorado Springs, Colorado in May 1981. Petitioner is an ordained minister in the "Pentecostal Church of God in America" faith. During the taxable years 1982, 1983, and 1984, petitioner was the pastor of the Colorado Springs Fellowship Church. As part of her occupation *703 as pastor, petitioner conducted religious worship services, counseled members of the Church, and performed marriages, funerals, and baby dedications. While in Bamberg, Germany, petitioner acted as lay leader of the Bamberg Fellowship Group. For a period of time, petitioner received a salary from the members of the Bamberg Fellowship Group of up to $ 1,000 per month. This salary was eventually discontinued because the post's chaplain, Chaplain Smith, determined that petitioner's receipt of a salary from church members violated Army regulations and that members were required to make their contributions to the chaplain's fund from which amounts were then to be disbursed to petitioner. Petitioner received a salary of $ 220 from the chaplain's fund. While in Bamberg, Germany, petitioner also received cash transfers and tithes from members of the Bamberg Fellowship Group. Friction developed between petitioner and Chaplain Smith and, as a result, the United States Army conducted an investigation of petitioner's activities as lay leader of the Bamberg Fellowship Group. The investigation was to determine, among other things: (1) Whether there were any improprieties with respect to the *704 solicitation of money or gifts for petitioner or the Bamberg Fellowship Group; and (2) whether there were any improprieties with respect to the tithing procedures employed by petitioner and the Bamberg Fellowship Group. The investigating officer found that the monies deposited by the Bamberg Fellowship Group members into the weekly offertory decreased when Chaplain Smith informed petitioner that she had to receive a decreased salary directly from the chaplain's fund and that the monies received in the offertory had to be deposited into the chaplain's fund. The investigating officer also found that the practice of tithing began when Chaplain Smith informed petitioner that her salary was in violation of United States Army regulations. The investigating officer came to the "inexorable conclusion * * * that the institution of tithings is a subterfuge for Mrs. Banks' loss of salary, also referred to by her as a 'love gift'" and that it was "used as a ruse to provide Mrs. Banks with an augmented 'salary'." After returning to the United States in May 1981, petitioner formed the Colorado Springs Fellowship Church (the Church), which is described as a nondenominational protestant church *705 with a pentecostal background. During this time, petitioner continued to receive cash transfers from members of the Bamberg Fellowship Group who were still in Bamberg, Germany. Several members in the Bamberg Fellowship Group followed petitioner to Colorado Springs and became members of the Church. The Church was incorporated on June 1, 1982, as a nonprofit corporation under the laws of the State of Colorado. The Church received IRS approval as an organization exempt from taxation pursuant to section 501(c)(3) for the period of December 31, 1983, forward. The Church also received an exemption from local sales, use, and property taxes. Petitioner preached, as part of the Pentecostal religion, that members were to make tithes. Members of the Church also transferred cash to petitioner on four "special" days of each of the years in issue: petitioner's birthday, Mother's Day, the Church's anniversary, and Christmas. Prior to making these transfers, members of the Church met amongst themselves to discuss the transfers. Attached as an appendix is a list of transfers made by the individual church members on the four "special" days for each of the years in issue, as well as the totals *706 of these transfers. The individual "special" day transfers to petitioner, which are listed in the appendix, total $ 41,919 for 1982, $ 43,175 for 1983, and $ 46,900 for 1984. [3] Petitioner deposited most of the money she received on these four "special" days into her personal checking account and considered all the money transferred to her as her's to do with as she saw fit. After respondent commenced his examination of petitioners, they discontinued accepting transfers of money on the Church anniversary, petitioner's birthday, Christmas, and Mother's Day or any other occasion. *707 Daisy Bowden was a member of the Church, a church counselor, and petitioner's friend for 20 years. She collected a substantial portion of the monies transferred to petitioner on the four "special" days. Sometimes Daisy Bowden suggested the amount that members were to transfer to petitioner. The members transferred the funds to petitioner because she was their minister, she had done an outstanding job in the past, she was there to help them with their problems when they needed her, and they wanted to keep her as their minister in the future. In addition to the transfers to petitioner, members of the Church made contributions to the Church. The Church kept records of these contributions. These records reflect that the members contributed $ 25,693.75 to the Church in 1982, $ 109,807.41 in 1983, and $ 113,785.20 in 1984. The Church's bank account records indicate that the Church deposited $ 25,693.75 into its account in 1982, $ 112,107.41 in 1983, and $ 113,826.20 in 1984. On a monthly basis, with the exception of four months, the amount of contributions coincides exactly with the amount of deposits. [4]
*708 The Church also kept detailed records of its expenses. These records consisted of quarterly income statements which gave an itemized account of expenses and a monthly statement of expenses which identified disbursements from the Church bank account by check number and stated the reason for the disbursement. For the taxable years 1982, 1983, and 1984, petitioner drew a salary of $ 10,985, $ 17,223, and $ 41,945, respectively, from the Church. For the taxable years 1985, 1986, and 1987, petitioner drew a salary of $ 46,900, $ 48,800, and $ 44,850, respectively, from the Church. At the time of trial, her salary was $ 1,000 per week. Petitioners' income tax return for each of the years in issue was prepared by an employee of H & R Block. OPINION Respondent's notice of deficiency determined unreported income on the basis of deposits to petitioners' bank accounts. The evidence presented at trial indicated that the source of these deposits was the cash transfers which petitioner received from church members. Petitioners' primary contention is that these transfers were nontaxable gifts. Section 61(a) provides that gross income includes all income from whatever source derived unless *709 excluded by a specific provision of the Code. It is well established that compensation for services, in whatever form received, is includable in gross income. Sec. 61(a)(1); Commissioner v. Duberstein, 363 U.S. 278, 4 L. Ed. 2d 1218, 80 S. Ct. 1190 (1960); Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 73 L. Ed. 918, 49 S. Ct. 499 (1929). Section 102(a) excludes from gross income the value of property acquired by gift. Whether a payment is a gift under section 102(a) or gross income under section 61(a) is a factual question, and petitioners bear the burden of proof. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933). In Commissioner v. Duberstein, supra at 285-286, the Supreme Court stated the governing principles in this area: the mere absence of a legal or moral obligation to make such a payment does not establish that it is a gift. And, importantly, if the payment proceeds primarily from "the constraining force of any moral or legal duty," or from "the incentive of anticipated benefit" of an economic nature, it is not a gift. And, conversely, "where the payment is in return for services rendered, it is irrelevant that the donor derives no *710 economic benefit from it." A gift in the statutory sense, on the other hand, proceeds from a "detached and disinterested generosity," "out of affection, respect, admiration, charity or like impulses." And in this regard, the most critical consideration, * * * is the transferor's "intention." "What controls is the intention with which payment, however voluntary, has been made." [Fn. refs. and citations omitted.]
The intention of the transferor is a question of fact to be determined by "the application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case." Commissioner v. Duberstein, supra at 289. We must make an objective inquiry into the circumstances surrounding the transfer rather than relying on the transferor's subjective characterization of the transfer. Commissioner v. Duberstein, supra at 286; Bogardus v. Commissioner, 302 U.S. 34, 43, 82 L. Ed. 32, 58 S. Ct. 61 (1937). Applying these principles to the facts of this case, we find that petitioner has failed to prove that the amounts of money she received from her congregation were gifts within the meaning of section *711 102(a). The transfers arose out of petitioner's relationship with her congregation as its minister. Petitioners presented the testimony of several members of her congregation. [5] These witnesses testified that they made transfers to petitioner because she was their pastor. They also testified that they made the transfers because of their "appreciation" of petitioner and her ministry, because she had done a lot of things for them and was there to help them with their problems, and to say thank you. One member testified that the transfers were made because petitioner was a good pastor and the congregation wanted to keep her. This indicates that the transfers were in consideration for services rendered and, therefore, negates the essential element of a gift. Webber v. Commissioner, 219 F.2d 834, 836 (10th Cir. 1955). The evidence indicates that the primary reason for the transfers at issue was not detached and disinterested generosity, but rather, the church members' desire to reward petitioner for her services as a pastor and their desire that she remain in that capacity. *712 There was strong, objective evidence that the amounts transferred to petitioner were part of a highly structured program for transferring money to petitioner on a regular basis. All the transfers reflected on the affidavits were made on the same four "special" days of each year. Almost all the individuals listed on the affidavits made transfers on these specified dates. From year to year, transfers on certain dates tended to be larger than transfers on other dates. For instance, for each of the years in issue, the transfers on the Church's anniversary were approximately four times the amount of the transfers on petitioner's birthday. Also, the transfers on a particular date from the various members were, for the most part, limited to two or three denominational amounts. The regularity of the payments from member to member and year to year indicates that they were the result of a highly organized program to transfer cash from church members to petitioner. The existence of such a program suggests that the transfers did not emanate from a detached and disinterested generosity but, instead, were designed to compensate petitioner for her service as a minister. [6]
*713 Respondent presented the testimony of Walter McVicker. Mr. McVicker was a member of petitioner's congregation in both Bamberg, Germany, and Colorado Springs, Colorado. Mr. McVicker testified that the practice of making transfers to petitioner began in Germany. Mr. McVicker testified that members made pledges [7] of cash to petitioner on the four "special" days of the year and that the amount "pledged" by the individual church members was determined at open meetings at the Church. Mr. McVicker testified that on the occasions when he was close to failing to meet his pledges, he was counseled that failure to pay the pledge was like going back on his word to God, and that it was more important to pay the pledge than it was to pay his rent and utility bills. Mr. McVicker also testified that before one became an official member of the Church, they had to understand the tithing and pledging system. After *714 reviewing the entire record, we find that the transfers from the church members to petitioner were compensation for services. Accordingly, we hold for respondent on this issue. We note that respondent does not contend, nor do we find, that any of the contributions to the Church represent taxable income to petitioners. The Church's bank records indicate that contributions to the Church were deposited into its account, and the testimony at trial indicates that most of the transfers to petitioner were deposited into her personal account. Respondent's determination is based on actual deposits to petitioners' personal bank account. Petitioners argue two alternative positions in the event that we find that the transfers to petitioner were compensation for services. First, they argue that petitioner received this income as a conduit for the Church and is therefore not taxable on it. Second, they argue that if we find that petitioner was not a conduit for the Church, then we should find that she nevertheless gave the money to the Church and other charities and is therefore entitled to an off-setting deduction under section 170. Both of these alternative arguments fail. With respect *715 to petitioners' claim that petitioner acted as a conduit or agent for her Church, the law is well settled that an agent is one who receives the funds as a true agent and has no claim of right to the funds. Goodwin v. Commissioner, 73 T.C. 215, 230 (1979), overruled on other grounds Wright v. Commissioner, 84 T.C. 636, 638 (1985); Diamond v. Commissioner, 56 T.C. 530, 541 (1971), affd. 492 F.2d 286 (7th Cir. 1974); see also Florists' Transworld Delivery Assn. v. Commissioner, 67 T.C. 333 (1976). At trial, petitioner testified that the money was given to her outright and with no strings attached. Thus, the argument that petitioner acted as an agent or conduit is inconsistent with her own testimony. In addition, the Church kept detailed records of its receipts and expenditures and used its own separate bank account for its financial transactions. Petitioner did not present similar records of her receipts and expenditures in her capacity as the Church's agent. With respect to petitioners' argument that they are entitled to an off-setting deduction under section 170 because petitioner *716 contributed the funds to her Church and other charities, we are unable to determine the amount of section 170 contributions, if any, that petitioner made. Petitioners failed to introduce documents supporting their alleged contributions. See sec. 1.170A-13, Income Tax Regs. On brief, petitioners acknowledge their inability to document their alleged contributions and ask us to apply the rule enunciated in Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). In Cohan, the Second Circuit held that when the evidence indicates that a taxpayer incurred deductible expenses, but the taxpayer is unable to substantiate the amount of the expenses, the Court should approximate the amount of deduction as much as possible, "bearing heavily * * * upon the taxpayer whose inexactitude is of his own making." Cohan v. Commissioner, supra at 544. In order for the Cohan rule to apply, petitioners must establish that they actually made contributions which are deductible under section 170 and provide us with some basis for estimating the amount of the contributions. Recklitis v. Commissioner, 91 T.C. 874, 895 (1988); Ronnen v. Commissioner, 90 T.C. 74, 102-103 (1988); *717 Epp v. Commissioner, 78 T.C. 801, 807 (1982). Petitioners presented no credible evidence which would provide us with some basis for estimating the amount of the contributions, if any. [8] In light of the fact that petitioners have not, in any event, met the requirements of the Cohan rule, we need not decide whether the Cohan rule applies to years governed by the substantiation requirements of section 1.170A-13, Income Tax Regs.
Finally, we note that both petitioners' conduit and the offsetting deduction theories involve transfers *718 of money from them to or on behalf of the Church. Petitioners testified that most of the money which was transferred to petitioner from church members was deposited into their checking account. Thus, in order for the money to be transferred to or for the benefit of the Church, the money would have to be withdrawn from their checking account. On brief, petitioners admit that they had all their canceled checks and bank statements but did not introduce them into evidence because they could not recall what the specific expenditures were for. [9]
Petitioners also argue that if we find that the transfers are taxable to them and that they do not qualify for any offsetting deductions, then they are entitled to income averaging under sections 1301 through 1305. Petitioners bear the burden of proving that they are entitled to income averaging. Rule 142(a). Under section 1301, taxpayers *719 whose averagable income for the computational year exceeds $ 3,000 are entitled to income averaging. For purposes of this case, averagable income for taxable years 1982 and 1983 equals the amount by which taxable income for the computational year exceeds 120 percent of average base income, and averagable income for the taxable year 1984 equals the amount by which taxable income for the computational year exceeds 140 percent of average base income. Sec. 1302(a)(1). For purposes of this case, average base income for taxable years 1982 and 1983 equals the average taxable income for the 4 taxable years immediately preceding the computational year, and for the taxable year 1984, average base income equals the average taxable income for the 3 taxable years immediately preceding the computational year. Sec. 1302(b) and (c). Petitioners have failed to present evidence of their taxable income for the 4 years immediately preceding taxable years 1982 and 1983 and the 3 years immediately preceding the taxable year 1984. Consequently, we are unable to determine that they are entitled to income averaging. The next issue for decision is whether petitioners are liable for the additions to *720 tax for negligence or intentional disregard of rules or regulations under section 6653(a)(1) and (2). Section 6653(a)(1) imposes a 5-percent addition to tax if any part of any underpayment of tax is due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) provides for a separate addition to tax equal to 50 percent of the interest payable on the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations. Respondent's determination is presumed correct and petitioners bear the burden of proving otherwise. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Negligence within the meaning of section 6653(a) has been defined as the "failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners argue on brief that they believed that the transfers were gifts and therefore are not taxable. Petitioners subjective belief is not at issue; the issue is whether a reasonable person would have believed that these transfers were gifts under section 102. After reviewing the *721 entire record, we believe that a reasonable person under the circumstances would not have reached this conclusion. Petitioners also argue that they are not negligent because they relied on advice from a return preparer and a representative of respondent. If a taxpayer shows good faith reliance upon the advice of a competent and experienced accountant or attorney in the preparation of a tax return, the addition to tax for negligence does not apply. Conlorez Corp. v. Commissioner, 51 T.C. 467, 474-475 (1968). To show good faith reliance, the taxpayer must establish that the return preparer was supplied with all necessary information and that the incorrect return resulted from the preparer's mistakes. Pessin v. Commissioner, 59 T.C. 473, 489 (1972). Petitioners failed to make this showing. Petitioners also allege that an employee of the Internal Revenue Service had advised them that the amounts in issue were not taxable. Petitioner testified that she told respondent's representative that the transfers she received were gifts. We fail to see how petitioners can shift the responsibility of underreporting income when they supplied the representative, *722 upon whose advice they allege they relied, with incorrect information. Petitioners have failed to satisfy their burden of proof, and we hold for respondent on this issue. The final issue for decision is whether petitioners are liable for additions to tax under section 6661 for substantial understatement of income tax liability. Section 6661 imposes an addition to tax in an amount equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. [10]Pallottini v. Commissioner, 90 T.C. 498 (1988). The amount of the understatement is equal to the excess of the amount of tax required to be shown on the return for the tax year less the amount of the tax shown on the return. Woods v. Commissioner, 91 T.C. 88, 94 (1988). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return, or $ 5,000. Sec. 6661(b)(1). The deficiencies that we uphold for 1982, 1983, and 1984 qualify as "substantial understatements" as defined in section 6661(b). *723 Petitioners argue that they are entitled to relief under section 6661(c). The reasonable cause exception to section 6661, under which petitioners seek relief, provides that the Secretary may waive the addition to tax under section 6661 upon a showing by the taxpayer that there was reasonable cause for the understatement and that the taxpayer acted in good faith. Sec. 6661(c) (emphasis supplied). We only review respondent's decision not to waive the section 6661 addition to tax upon a showing by petitioners that respondent abused his discretion in refusing to waive the addition to tax. Mailman v. Commissioner, 91 T.C. 1079, 1083, 1085 (1988). The Secretary has not agreed to waive the section 6661 additions to tax, and petitioners have not shown that the Secretary abused his discretion by not granting a waiver. Accordingly, we hold for respondent on this issue. To reflect concessions, Decision will be entered under Rule 155. APPENDIX TRANSFERS TO ROSE M. BANKS 1982
Rose Banks'
Mother's
Church
1982
Birthday
Day
Anniv.
Christmas
Totals
Anderson, Odette
$ 100
$ 25
$ 500
$ 500
$ 1,125
Anderson, Robert
100
25
500
500
1,125
Bowden, Daisy
250
100
1,000
500
1,850
Bowden, Norman
250
100
1,000
500
1,850
Clark, Amos
Clincy, Brenda
100
25
500
250
875
Cook, Cindy
250
25
1,000
250
1,525
Cook, Noel
250
25
1,000
250
1,525
Cox, Anthonette (Willie)
250
50
250
125
675
Cox, Herman
250
50
250
125
675
Dear, Alrene
100
25
500
250
875
Goggans, Janice
300
100
3,000
500
3,900
Graham, Leanna
300
100
1,500
500
2,400
Griffin, Michael
100
25
1,000
500
1,625
Griffin, Vanessa
100
25
500
250
875
Harper, Denver
100
50
250
250
650
Harper, Sarah
100
50
250
250
650
Harris, Joyce
100
25
250
125
500
Harris, Kirk
100
25
250
125
500
Henley, Jesse
100
50
250
250
650
Henley, Wilma
100
50
250
250
650
Jewell, Derek
100
50
250
400
Jewell, Gwendolyn
100
50
250
400
Junious, Frank
200
50
500
250
1,000
LaSalle, Gilda
100
25
500
500
1,125
Leslie, Helen
100
25
250
125
500
Leslie, Jimmy
100
25
250
125
500
McGhee, Delinda
100
25
250
150
525
McGhee, Larry
100
25
250
150
525
Munoz, Jacqualine
100
25
500
250
875
Nelson, Morrell (Arlene)
125
25
1,500
500
2,150
Phillips, Curtis
125
100
500
500
1,225
Phillips, Ingrid
125
100
500
500
1,225
Pope, Cromwell
Pope, Lynette
Rhoades, James
100
25
250
172
547
Rhoades, Sylvia
100
25
250
172
547
Sanders, Frederick
500
2,000
1,000
3,500
Spurlock, Garrett
Spurlock, Ruth
Stewart, Clinton
200
50
500
500
1,250
Stewart, Dana
Wilson, Ella
100
25
500
500
1,125
Total:
$ 5,675
$ 1,600
$ 23,000
$ 11,644
$ 41,919
*724 1983
Rose Banks'
Mother's
Church
1983
Birthday
Day
Anniv.
Christmas
Totals
Anderson, Odette
$ 100
$ 25
$ 250
$ 250
$ 625
Anderson, Robert
100
25
250
250
625
Bowden, Daisy
250
50
1,000
500
1,800
Bowden, Norman
250
50
1,000
500
1,800
Clark, Amos
100
25
600
250
975
Clincy, Brenda
125
25
500
250
900
Cook, Cindy
250
50
500
250
1,050
Cook, Noel
250
50
500
250
1,050
Cox, Anthonette (Willie)
250
50
500
250
1,050
Cox, Herman
250
50
500
250
1,050
Dear, Alrene
100
25
500
250
875
Goggans, Janice
300
100
1,500
500
2,400
Graham, Leanna
300
100
1,500
500
2,400
Griffin, Michael
100
25
1,000
200
1,335
Griffin, Vanessa
100
25
500
250
875
Harper, Denver
100
50
250
125
525
Harper, Sarah
100
50
250
125
525
Harris, Joyce
100
25
250
125
500
Harris, Kirk
100
25
250
125
500
Henley, Jesse
100
50
250
250
650
Henley, Wilma
100
50
250
250
650
Jewell, Derek
100
25
250
125
500
Jewell, Gwendolyn
100
50
250
125
525
Junious, Frank
100
25
500
250
875
LaSalle, Gilda
100
25
500
500
1,125
Leslie, Helen
100
25
500
100
725
Leslie, Jimmy
100
25
500
100
725
McGhee, Delinda
100
25
250
125
500
McGhee, Larry
100
25
250
125
500
Munoz, Jacqualine
100
25
500
250
875
Nelson, Morrell (Arlene)
100
25
500
250
875
Phillips, Curtis
125
100
500
250
975
Phillips, Ingrid
125
100
500
250
975
Pope, Cromwell
100
25
1,100
500
1,725
Pope, Lynette
100
25
1,100
500
1,725
Rhoades, James
100
25
250
250
625
Rhoades, Sylvia
100
25
250
250
625
Sanders, Frederick
500
2,000
1,000
3,500
Spurlock, Garrett
100
25
250
125
500
Spurlock, Ruth
100
50
250
125
525
Stewart, Clinton
200
50
1,000
500
1,750
Stewart, Dana
Wilson, Ella
100
25
500
500
875
Total:
$ 6,075
$ 1,650
$ 23,800
$ 11,900
$ 43,175
*725 1984
Rose Banks'
Mother's
Church
1984
Birthday
Day
Anniv.
Christmas
Totals
Anderson, Odette
$ 100
$ 25
$ 250
$ 250
$ 625
Anderson, Robert
100
25
250
250
625
Bowden, Daisy
250
50
1,000
500
1,800
Bowden, Norman
250
50
1,000
500
1,800
Clark, Amos
100
25
500
250
875
Clincy, Brenda
125
25
500
500
1,150
Cook, Cindy
250
50
500
200
1,000
Cook, Noel
250
50
500
200
1,000
Cox, Anthonette (Willie)
250
25
500
250
1,025
Cox, Herman
250
25
500
250
1,025
Dear, Alrene
100
25
500
500
1,125
Goggans, Janice
100
25
1,000
500
1,625
Graham, Leanna
500
50
6,000
1,000
7,550
Griffin, Michael
100
25
1,000
200
1,325
Griffin, Vanessa
100
25
1,000
250
1,375
Harper, Denver
100
25
250
250
625
Harper, Sarah
100
25
250
250
625
Harris, Joyce
100
25
250
250
625
Harris, Kirk
100
25
250
250
625
Henley, Jesse
100
25
250
200
575
Henley, Wilma
100
25
250
200
575
Jewell, Derek
100
25
200
200
525
Jewell, Gwendolyn
100
25
200
200
525
Junious, Frank
100
25
500
500
1,125
LaSalle, Gilda
100
25
500
250
875
Leslie, Helen
100
25
125
250
500
Leslie, Jimmy
100
25
125
250
500
McGhee, Delinda
100
25
200
200
525
McGhee, Larry
100
25
200
200
525
Munoz, Jacqualine
100
25
400
400
925
Nelson, Morrell (Arlene)
100
25
500
500
1,125
Phillips, Curtis
250
50
500
500
1,300
Phillips, Ingrid
250
50
500
500
1,300
Pope, Cromwell
100
25
250
250
625
Pope, Lynette
100
25
250
250
625
Rhoades, James
100
25
250
250
625
Rhoades, Sylvia
100
25
250
250
625
Sanders, Frederick
500
2,000
1,000
3,500
Spurlock, Garrett
100
25
250
250
625
Spurlock, Ruth
100
25
250
250
625
Stewart, Clinton
100
25
300
300
725
Stewart, Dana
100
25
300
300
725
Wilson, Ella
100
25
500
250
875
Total:
$ 6,325
$ 1,225
$ 25,050
$ 14,300
$ 46,900
*726 1983, 1984, 1985
Grand Total
Anderson, Odette
$ 2,375
Anderson, Robert
2,375
Bowden, Daisy
5,450
Bowden, Norman
5,450
Clark, Amos
1,850
Clincy, Brenda
2,925
Cook, Cindy
3,575
Cook, Noel
3,575
Cox, Anthonette (Willie)
2,750
Cox, Herman
2,750
Dear, Alrene
2,875
Goggans, Janice
7,925
Graham, Leanna
12,350
Griffin, Michael
4,275
Griffin, Vanessa
3,125
Harper, Denver
1,800
Harper, Sarah
1,800
Harris, Joyce
1,625
Harris, Kirk
1,625
Henley, Jesse
1,875
Henley, Wilma
1,875
Jewell, Derek
1,425
Jewell, Gwendolyn
1,450
Junious, Frank
3,000
LaSalle, Gilda
3,125
Leslie, Helen
1,725
Leslie, Jimmy
1,725
McGhee, Delinda
1,550
McGhee, Larry
1,550
Munoz, Jacqualine
2,675
Nelson, Morrell (Arlene)
4,150
Phillips, Curtis
3,500
Phillips, Ingrid
3,500
Pope, Cromwell
2,350
Pope, Lynette
2,350
Rhoades, James
1,797
Rhoades, Sylvia
1,797
Sanders, Frederick
10,500
Spurlock, Garrett
1,125
Spurlock, Ruth
1,150
Stewart, Clinton
3,725
Stewart, Dana
725
Wilson, Ella
2,875
$ 131,994
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Respondent based his deficiency determination on bank deposits which he contends represent unreported income. Respondent concedes that $ 3,000 of the deposits which he included in his determination in 1983 does not represent unreported income. The parties now stipulate that the amount of deposits in dispute is $ 47,430, $ 52,266, and $ 43,382 for the taxable years 1982, 1983, and 1984, respectively. The parties specifically call upon this Court to determine the character of these deposits.↩
3. The information in the appendix is derived from affidavits obtained by petitioners for use in this case. We note that the total amounts reflected on these affidavits for 1982 and 1983 are less than the amount of bank deposits which respondent determined represented unreported income. At trial, petitioners' counsel acknowledged that transfers from at least one former member were not reflected on the affidavits because petitioners were unable to contact him. We do not know whether other former church members also were not contacted. Moreover, the affidavits only reflect transfers made on the four "special" days of the year. Several witnesses testified that they made "gifts" to petitioner on other days of the year. For 1984, respondent determined unreported income of $ 43,382 based on petitioners' bank deposits. The affidavits for 1984 reflect $ 46,900 in transfers. Respondent has not claimed an increased deficiency for 1984 on the basis of these affidavits.↩
4. The deposits for Feb. 1984 were $ 375 less than the contributions for that month. However, the deposits for Mar. 1984 were $ 375 more than the contributions for that month. The deposits in July 1984 were $ 41 more than the contributions, and the deposits in May 1983 were $ 2,300 more than the contributions.↩
5. The parties stipulate that the testimony of these members is representative of the testimony that would be given by other members of the congregation.↩
6. In what appears to be an attempt to show that the transfers were spontaneous, some of the witnesses testified that they did not know when other members made transfers to petitioner or the amounts of those transfers, if any. However, other witnesses testified that there were group meetings held to determine the amount that the members would transfer to petitioner on the four "special" days of the year. The affidavits, which petitioners procured for purposes of this trial, indicate that almost all the individuals listed on the affidavits made transfers to petitioner on the four "special" days of the year and that these transfers were similar in amount. See appendix.↩
7. By using the word "pledge," we do not mean to indicate that these transfers were voluntary gifts or donations.↩
8. Petitioners argue on brief that the testimony indicates that all the money transferred to petitioner was utilized for the Church, parsonage, charities, and the needy. The testimony cited by them in support of this position clearly states that the funds were used, in part, for personal use. On their returns, petitioners deducted charitable contributions in the amounts of $ 150, $ 6,000, and $ 6,000 during the taxable years 1982, 1983, and 1984, respectively.↩
9. By contrast, the church's records identified disbursements from its account by check number and indicated the nature of the expenditure.↩
10. The Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, sec. 8002(a), 100 Stat. 1874, 1951, increased the section 6661(a)↩ addition to tax to 25 percent of the underpayment attributable to a substantial understatement for additions to tax assessed after Oct. 21, 1986.